Statement of the Case.
MONROE, J.
Defendant has appealed from a judgment awarding plaintiffs $7,500 as damages for the loss of their son, a lad in his seventeenth year, who is alleged to have sustained injuries, whereof he died, through defendant’s negligence; the defense being a general denial and a plea of contributory negligence. Defendant and BrooksScanlon Lumber Company are under the same control, and are what may be called “interlocking corporations”; that is to say, a majority of the stock in each is owned by the same parties, the offices of the two companies are in the same building, the lumber mills of Brooks-Scanlon Company are in or adjacent to defendant’s “railroad yards,” the raw material used in and the manufactured product of the mills are handled by defendant, defendant’s employés — a considerable proportion of them — are carried on the Brooks-Scanlon Company’s pay rolls, and altogether it is not clear where the separate interest of the one corporation begins and that of the other ends. Defendant’s machine shop, a building 60 or 70 feet long (the employés in which, though paid by the Brooks-Scanlon Company, are employed by defendant), is situated on the east side of and about 5 feet distant from its main track. On the same side, at a distance of from 100 to 200 yards north by east from the machine shop, is the “new [Brooks-Scanlon] mill.” To the westward of the main track and about 10 feet distant therefrom, at a point opposite the machine shop, is a standard gauge switch track. To the westward of that is a narrow gauge switch track. *855 To the westward of the narrow gauge track, and, say, 50 or 60 feet to the southward of a line running westward from the lower end of the machine shop, is the upper end of the “old [Brooks-Scanlon] mill,” which extends southward for 75 or 100 yards, and the loading platforms of which are as near to the track as they could well be placed. And below the “old mill” is the spring, from which all persons connected with the entire plant are supplied with drinking water, by water carriers, who carry it to the different parts of the plant in buckets. At a point about opposite and to the eastward of the spring there is a switch, called the “new shop track,” which runs north by east from the main track, passing behind the machine shop and connecting with a switch track of the Illinois Central Railroad, which latter runs directly into the “new mill.” Defendant’s general manager says that locomotives are stored, or parked, on the new shop track at nights and on Sundays, but that otherwise than on Sundays the track is unobstructed in the daytime, and that a person carrying water from the spring to the new mill could use it as a pathway, or that he could make his way along that route upon the outside of the track. The testimony, however, largely preponderates to the effect that, at the time of the accident here in question, the new shop track and the ground outside of it, as also the ground upon either side of the main track, from a point opposite the spring to a point, say, 30 yards to the northward of the machine shop, were more or less obstructed at all times, and were impracticable for pedestrians, particularly for one carrying two buckets of water, and that, as a matter of fact, the employés of the entire plant, to the number of, say, 150, as also the public at large (meaning all persons not so employed, but having business at the machine shop or the new mill), constantly and habitually, to the knowledge and with the acquiescence of those in authority, made use of the main track as a highway; the two switch tracks in front of the machine shop, though uninclosed and unsheltered being used as, and being called, “the repair shop,” and the material, such as old lumber, iron junk, ear wheels, etc., taken from or left over in the repairing of the freight and log cars being scattered up and down upon the sides of and between the main and switch tracks for a distance of 100 or 150 yards to the southward, and, say, 30 yards to the northward, of the machine shop. On the morning of the accident (June 7, 1910) work began at the new mill, the old mill, and the machine shop at 6 o’clock, which was the usual hour, and at about a quarter past 6 Lester Lea, plaintiffs’ son, in the discharge of the duty for which he was employed, was on his way from the spring to the new mill with two buckets of water, which were suspended, by means of straps from the ends of'a piece of wood, or a yoke, that rested upon his shoulders, and walking northward on the main track, with a straight and unobstructed stretch of, say, 500 feet behind him, had reached a point about opposite the middle of the machine shop, when he was overtaken and run down by defendant’s locomotive No. 1208, which was moving northward, with the tender in front, at the rate of 10 or 12 miles an hour; no effort having been made to stop or cheek its speed until the moment at which he was run down. The engine had been parked for the night on the new shop track, and in the morning the fireman, Etto Magee, in co-operation with Willie Westhrope, a brakeman, brought it out, with the pilot in front, on the main track, and, having run it down the main track until it cleared the switch, backed it northward until it ran down the water carrier as stated; Westhrope getting aboard as the locomotive passed the switch and taking *857 a position on the fireman’s, or east, side, and Magee occupying the engineer’s place on the west side. It appears that at a point som,e distance below the switch, or, say, 1,000 feet to the southward of the machine shop, there was a passenger station, and that when Magee brought engine No. 1208 out on the main track Engineer Thornhill was engaged,' with engine No. 24, in making up a passenger or mixed train, which was scheduled to leave the depot within a little while, and Magee says in his testimony:
“He [Thornhill] was whistling for me to come out and clear the way for the other local below me.”
In other words, Thornhill needed the tracks for switching purposes in the making up of his train, and so indicated by his signals, and we are inclined to think that Ma-gee,- who was a negro, was more concerned about getting out of Thornhill’s way than about the condition otherwise surrounding him, and hence paid less attention to what might be happening in the other direction; that impression being strengthened by the testimony of Westhrope, a white man, who, being asked whether, whilst ■ standing at the switch, he saw any one on the track to the northward, replied:
“No, sir; I don’t know if I noticed any one on the track or not. I could have seen any one on the track from where I was — any one up north on the track. I don’t know if I looked up the track. There was another engine there waiting for [us] to get out of its way, and we were delaying that engine, and I had my mind on getting out of its way as soon as I could.”
At all events, Magee does not appear, at any time from the moment that he started to back the locomotive to that when he ran down the water carrier, to have looked in the direction in which he was backing; for he himself testifies that he was engaged during that time in feeding his lubricator, with his face toward the south; and it is shown conclusively by the testimony of several witnesses, who were within a few feet of the spot where young Lea- was overtaken, and who saw that the tragedy was impending, and endeavored by shouting to Magee and otherwise signaling to him to avert it, that he was looking to the westward, or southward — the admitted facts being that neither he nor Westhrope saw Lea until after he had been run down, and that neither of them suspected that danger to any one was impending until they heard the warning shouts of the persons near by. It is not shown, positively, at what point Lea entered upon the main track; but from the evidence to the effect that the route by way of that track, between the spring, or a point about opposite the spring, and the place where he was run down, was the only practicable one for him to take, that he was first seen walking up the track, and was not seen anywhere else, and that the track was the route usually taken, even by persons who were not incumbered as he was, we regard it as’reasonably certain that he entered upon the track at the point referred to, or, say, 400 feet south of that at which he was run down, and that the locomotive started backing in a northerly direction from a point, say, 200 feet still farther to the south.
The testimony authorizes the conclusion that the locomotive moved at the rate of 10 miles an hour (most of the witnesses saying 10 or 12 miles), at which rate it must have covered the distance (600 feet) between its starting point and the point of collision in, say, 44 seconds, during which time the boy, moving, we will say, at the rate of 2y2 miles an hour, traveled one-fourth of that distance, so that when the locomotive started he mus-t have been within about 150 feet of the point at which he was overtaken, and might readily have been seen, as the track was straight, if either Magee or Westhrope had looked in the direction in which they were moving.
*859 Opinion.
The points relied upon by way of defense may be stated in two propositions: That plaintiffs’ son, when injured, was a trespasser on defendant’s property, to whom defendant owed no duty, save to refrain from willfully injuring him; and that he was guilty of contributory negligence in using the track as a highway at a time when he must have known that it would be used by locomotives, and in failing to notice that the engine by which he was injured was approaching him from behind, and to get out of its way by stepping off the track.
[1] Considering the proposition first stated, it is shown that plaintiffs’ son had been employed, to carry water from the spring to the new mill, for about two weeks before the accident, and that his employer was the Brooks-Scanlon Company. It is admitted that the same persons who owned the majority of the stock of that company also owned the majority of the stock of the defendant company; and, whilst it is said that not all of the stock in the two companies was owned by the same persons, the amount that was not so owned is not shown. In any event, it is reasonable to suppose that, the owners of the majority of the stock of each company being the same, the policy adopted and acted on by each company was controlled by and in the interest of the same persons.
It is admitted that the railroad company owned the machine shop, repair shop, railroad yards, locomotives, etc.; but it is shown that the workmen in the machine shop, though employed by the railroad company, were paid by the lumber company, and if the lumber mills are not actually within the limits of the railroad yards they are so situated that the use of the yards is absolutely essential to the conduct of their business. Drinking water was, of course, necessary to the conduct of the business of the new mill, where 80 or 100 workmen were employed; and it is undisputed that the only source of supply was the spring, between which and the mill (if they are not both within the limits of the yards) lie the railroad yards. Most of the witnesses testify that the only route by which a carrier could bring the water from the spring to the mill was through the yards by way of the main track; and no one denies that that was the most direct and easiest route, or denies that it was the only route that was ever used. When, therefore, young Lea, two weeks before his death, assumed the duties of water carrier for the new mill, the persons owning the majority of the stock in both the lumber company and the railroad company, and equally interested in the success of both, speaking through the agents employed by them to manage the affairs of those corporations, said to him, in effect:
“You will bring the water from the spring, and your best route will be over the main track, past the machine shop, since the demands of our business — lumber and transportation — make it necessary for us to block up the other avenues of access to the spring by using the adjacent land for other purposes.”
It is true that no specific instructions are shown to have been given; but the situation rendered it unnecessary that they should be, since the situation of the spring and the only practicable route for a water carrier between it and the new mill were equally well known. Apart from the testimony of other witnesses, Mr. Keyes, defendant’s general manager, testified upon that subject, in part, as follows:
“Q. The Kentwood & Eastern Railway Company have known of this public use — I say public use advisedly — they have known of this public use that has been made of their railroad tracks all along? A. I have seen people walking along the track. Q. Everybody uses it that wishes? A. Yes, sir.”
It will not do, therefore, for the defendant now to say that young Lea was injured whilst trespassing on its property. No one *861 can be said to trespass upon the property of another when he enters upon it with the consent and in the interest, and in accordance with the wishes and expectation, of the owner.
Nor, since young Lea entered upon the property under those conditions, can defendant be heard to say that it owed him no duty, save to refrain from willfully injuring him; for, consenting, knowing, and expecting, in its own interest, that he would or might be there, it was bound to exercise precaution with reference to and commensurate with that possibility. It may be thought that we are losing sight of the difference between the interest of the defendant corporation and that of the holders of its stock; but, as we see the facts with which we are dealing, those interests were identical. At all events, those in charge of the business of the defendant acted upon the belief that they were, in sanctioning the use of its property by the employes of another corporation, controlled by the same stockholders, and the business of which was largely the business of the defendant.
“The word ‘corporation,’ ” says a well-known author, “is a collective name for the corporators or members who compose an incorporated association; and when it is said that a corporation is itself a person, or being, or creature, this must be understood in a figurative sense only. =? * * Although a corporation is frequently spoken of as a person or unit, it is essential to a clear understanding of many important branches of the law of corporations to bear in mind distinctly that the existence of a corporation, independently of its shareholders, is a fiction; and that the rights and duties of an incorporated association are, in reality, the rights and duties of the persons who compose it, and not of imaginary beings.” Private Corporations, Morawetz, pp. 1, 2.
[2] As defendant’s main track was in common use as a highway, and as plaintiffs’ son was not only permitted, but, as we think, expected, to use it in the interest, not only of the lumber company, but of the same stockholders controlling the management of the defendant railroad company, and as the officers of the two corporations were better qualified to judge of the danger than a boy of 17, who had been employed in the plant for two weeks, we find no basis for the support of the contention that it was negligence per se in him to make such use of the track. Nor do we find that he was negligent in using the track when he did (if we are correct in our conclusion that he so entered at a point opposite the spring), since at that time the track was clear and locomotive 1208 had, in all probability, not been started from its berth on the new shop track. Seeing nothing that threatened danger, therefore, the lad trudged along with a bucket of water suspended from each shoulder and balanced by each hand, intent rather upon delivering the water at the mill, and upon what he saw and heard before him, than upon what might take place behind him, and he must have reached a point about opposite the old mill, on his left, and not far from the machine shop, to the right of the track, and, perhaps somewhat farther along, before the locomotive in question whistled below the switch for its backward run behind him. We are bound to assume that he did not hear the whistle, or did not understand its significance; and there is nothing to show that he either heard or understood. On the other hand, from the testimony of several of the witnesses, it appears not unlikely that the noise of the machinery in the two mills, particularly the old mill, because it was nearer to him, and of an exhaust pipe in the machine shop, may have prevented him from hearing either the whistling or the approach of the locomotive; and it is to be remembered that the locomotive, leaving its starting point, some 600 feet south of the point at which the accident occurred, covered that distance and ran over him in about two-thirds of a minute, or, say, 4A seconds. We are of opinion that the boy was negligent in walking up the track without looking behind *863 him, or without looking often enough, for he may have looked at the moment that locomotive 1208 was headed down the track for the purpose of clearing the switch; but we are also of opinion that such negligence was not the proximate cause of his being run over. That cause, we think, is to be found in the fact that the locomotive followed him up the track, running with the tender in front and no lookout, either upon the tender or in the cab, and, so far as concerned the safety of any who might be on the track, as though it had been allowed to run wild. If it had been otherwise, and Magee or Westhrope, on the locomotive, had seen the boy, incumbered as he was and walking away, with his back to them, as they might have done, and were bound to have done, if they had looked in the direction in which they were going, the accident could easily have been averted. But Magee admits that he never once looked to the northward from the time that he started in that direction; and, whilst Westhrope says that after he boarded the engine, as it passed the switch, he looked “part of the time ahead and part of the time back,” he also testifies, as we have stated, that he was intent upon getting out of the way of the locomotive No. 24; and he further testifies that from the cab of the engine a person could not be seen on the track (over the tender, as we understand) if within three rail lengths, which we take to be 90 feet. When, therefore, it is considered that only 44 seconds elapsed between the time that locomotive 1208 started northward and the time that it overtook and ran over Lea, that Westhrope’s attention was first attracted to the impending tragedy by the shouts of warning from persons near by, and that he saw Lea for the first time when his body rolled out from under the wheels of the tender, it can readily be understood that the time when he looked ahead must have been when the locomotive was within three rail lengths of Lea, and he was obscured from sight by the tender.
It is shown that the injured boy lived about seven hours after the accident, and was conscious during the whole of that time; that at first his physical suffering was not very great, though his right arm was crushed off at the shoulder, the upper portion of the right thigh was lacerated and crushed, and there was laceration of the right side, because of the shock which he had sustained and the consequent depression of his nervous system; and that thereafter his suffering was alleviated, to some extent, by the use of opiates. It appears, however, that the opiates were not used as freely as they would otherwise have been because of the request of his parents that they be permitted to see him and talk with him before he became unconscious or stupified. Plaintiffs claim damages as succeeding to the right of the decedent, and also in their own right for the loss of his aid and companionship, and for the mental suffering sustained by them by reason of his death. The case was tried without a jury, and the judge a quo awarded them $7,500. We are not prepared to say that the amount is excessive; and the judgment appealed from is affirmed.