*687 Statement of the Case.
MONROE, O. J.
Plaintiff appeals from a judgment rejecting her claim for damages for loss and injury sustained by reason of the death of her only child, a boy 10 years old, who was crushed to death under defendant’s automobile, occupied by him and driven by his chauffeur upon the principal street of this city at 10' o’clock in the morning of a bright, dry day in the month of October, 1913. The facts, as we find them from the evidence, are as follows:
The minor and a companion, who was two years older, were playing with a little homemade vehicle consisting of two pairs of small wheels, the axles of which were connected by a strip of plank with a soap box upon the rear end, and, at the corner of Broad and Canal streets, they attached it to an ice wagon, drawn by two mules, which was moving on the upper side of Canal street towards the river; the attachment having been made by slipping a rope, fastened probably, to the forward end of the plank, through the tailgate of the ice wagon and carrying the end back to their own vehicle, where it was held by the boy who survived to tell the story. The ice wagon moved at a slow pace upon the side of the roadway nearer to the neutral ground and had reached a point about midway of the square, or say 150 feet, from Broad street, when, according to defendant’s testimony, it and the little vehicle attached to it were seen by him, as he approached from behind, seated on the left side of the tonneau of his automobile, and had reached, or perhaps crossed, Broad street. He also testifies that the hom of his machine was blown at that time, and he thinks twice, but he further testifies as follows:
“Q. Did the driver of the ice wagon seem to hear the signals of your Olaxton horn? A. Positively, because he turned around, he didn’t turn the wagon; he turned his face. Q. How far were you from the ice wagon when he turned his face? A. About 20 feet.”
The chauffeur, on the other hand, testifies that, when he first saw the ice wagon, it was about 90 feet ahead of him, and that it was then that the horn was first blown; that the ice wagon was then near the neutral' ground; that he saw the boys in their vehicle, behind the wagon; that he could see them well; that the ice wagon turned towards the banquette, in order to allow him to pass to its left; that he then blew his horn again; and that, just' as he went to pass the wagon, “a hoy rau from behind the ice wagon into the machine.” He was asked, “Was the boy being carried?” and his answer was:
“He was in that wagon, right there, and they had two other little boys behind the ice wagon also. Q. Tou say the little b'ox that the boy was in was right behind the ice wagon? . A. Tes, sir.”
And, at another place:
“Q. What was pulling the boys in that little wagon? A. The ice wagon. Q. In what way? How was the ice wagon pulling them? A. They were holding on to the ice wagon. Q. How? A. With their hands. One of them was in the wagon, and the other two were on the sides. Q. Tou say there were three boys altogether? A'. Tes, sir; three boys altogether.”
The only other witness called by the defense was a little girl (14 years of age), who testifies that she was on the banquette just in front of the house opposite to which the little boy’s body was found after the accident; that he was the only boy that she saw; that the automobile was running in the middle of the roadway, was so running when it hit the wagon (referring to the soap box); that the soap box was then being pulled by the ice wagon; and that the automobile blew no horn at all; “it didn’t have a chance to blow it.”
. The driver of the ice wagon (called by plaintiff) testifies that he was driving along the roadway, on the left side, when he heard the horn of the automobile; that he turned around to see upon which side those who were in the machine expected to pass, and, finding that they were going to his left, he pulled as much as he could, towards the banquette (on *689 his right), and that, just then, he heard a noise behind his wagon, like a box breaking up, and he thought he had dropped a box off his wagon, but that, before he could get off, himself, defendant came up and said: “My God! I have run over a child. What shall I do?” and that he then looked and saw the hoy. (It seems that his wagon was so constructed that, from his seat in front, where he had the two mules to look after, he could not see things upon the ground in the rear of the wagon whence the noise that he had heard appeared to come.) The boy, survivor of the accident (called by plaintiff), testifies thal he. met the decedent at the corner of Broad and Canal streets, and that the latter (whose name was Frank, while that of the witness was Henry) was then, himself, running the soap box wagon; that he took the rope and hooked it through the tailgate of the ice wagon and held to the end. He was then asked whether he got into the soap box with Frank, and he answered, “Yes, sir,” but his examination then proceeds as follows:
“Q. Who had the rope? A. Me. Q. What did you do with the rope? A. I don’t know what they did with the rope— Q. I mean when you got in the little soap box wagon, you say you threw the rope— A. Yes, sir; 1 put the rope through there, and he was pushing himself, and he ran behind me, and I caught the end, and he guided the wagon.”
There would seem to be some little confusion, so far, in the boy’s testimony, upon the question whether he and Frank were both in the wagon at the moment of the accident, but later he testifies distinctly that such was the case. For instance, one of the questions asked on his cross-examination was:
“When the automobile hit the box, you boys were in the box, right behind— A. The ice wagon, right behind the ice wagon.”
We have no doubt, therefore, that his previous saying, “I put the rope through there, and he was pushing himself, and he ran behind me, and I caught the end and he guided the wagon,” is to be explained as follows: In order to push himself along in a soap box wagon, a boy must sit in the box (which has low sides and tailboard) with his back in the direction in which he is moving and his tiller ropes, consisting of a string, the ends of which are fastened to the forward axletree upon either side of the strip of plank which connects that axletree with the one in the rear, in his hands, and, when the witness says that Frank “ran behind” him, he does not mean to say that he was not in the box, but that, as one might say, speaking of an expedition in an automobile or airplane, ox-yacht, “I ran down to my place,” or “to Newport,” etc., meaning that his running consisted of the use of those means of transportation ; and, evidently, the witness assumed that any intelligent person would understand that much, and therefox-e considered it unnecessary to explain his meaning.
None of the witnesses who profess to have seen anything of the accident, save the chauffeur, saw more than two boys, or saw any boys, walking, or trotting, by the side of the soap box and holding, with their hands, to the ice wagon, and all of such witnesses, save the little girl who was called by defendant, saw more than one boy. A coixductor and motorman testify that defendant passed the car of which they were in charge two squares back of Broad street, just before the accident, and that his axxtomobile was moving at the rate of 16 or 18 miles an hour, a cdnclusion at which they arrived by comparing the speed with that of their car, whereas the city ordinance, at that time, limited the speed of automobiles, at that point, to 12 miles an hour. Defendant and his chauffeur testified that they were not moving beyond a 12 or 13 mile gait before reaching, Bx-oad street, and that they slowed down after blowing the horn, which is probably true. But, if they did not blow the horn until it was too late to avoid the accident, no matter how much they may have slowed down, neither the blowing nor the slowing could have availed anything. There are several other *691 witnesses — three young girls, aged 14, 15, and 16, respectively, who testify that they saw the accident, and practically corroborate the testimony of the little boy Henry. The connected statement of the defendant, when asked by his counsel to tell, in narrative form, what happened, reads as follows:
“Either before or after crossing Broad, I saw this ice wagon, ice delivery wagon, and, attached to it, either tied or held on, I couldn’t say, was the soap box, a contraption on wheels, in which I noticed two boys. My driver, chauffeur, sounded his Olaxton” (shown to be an electric horn, more powerful than others) “in order to give notice to the driver of this ice wagon to give him the right of way to the left. At the same time, he diminished his speed. As we came nearly opposite to the ice wagon, passing to his left, between the ice wagon and the curbing of the neutral ground, this little box, which had been attached to the ice wagon, swerved towards the neutral ground, on such short notice that it went right beneath the front wheel, and my machine could not be stopped until it entirely passed over him. It stopped in a length of the car of where this accident happened. I then alighted, and so did the chauffeur. I knew I had struck the boy in the wagon. There was only one in the wagon then, and I felt it strike him. I felt the impact when the wheels passed over the obstruction.”
Counsel for plaintiff seems to interpret the statement of the chauffeur to the effect that “a boy ran from behind the ice wagon into the machine,” as intended to convey the idea that the boy had previously been masked by the ice wagon and appeared as from a place of concealment; but we do not so understand it. Our idea is that the chauffeur meant to say that the boy, who was behind the ice wagon (but always in full view of the chauffeur, who was also behind it, though not, perhaps, always in a direct line), ran, suddenly (in his soap box affair), from behind the ice wagon (and he could have run from nowhere else) in front of the automobile, which, just then (as he is to b.e understood), was not in a direct line behind the ice wagon, but was about passing it, to the left; and hence that he (the chauffeur) was not at fault for running over him. In that connection, however, we have the following to add to the facts heretofore stated, to wit: The roadway upon which the accident occurred is 36 feet wide and perfectly straight for probably several miles, and it is not shown that defendant’s view of the ice wagon and its trailer, the soap box, was at any time obstructed from the moment that he first saw them. The body of the little boy was found about the middle of the roadway, so that there was a space of some IS feet between the point at which he was run over and the curb of the neutral ground, to the left, that was open to defendant for the passage of his automobile. Plaintiff’s counsel seemed desirous of finding out why it was that defendant, or his chauffeur, did not utilize some of that space, instead of attempting to pass the ice wagon, with the soap box wagon trailing behind, by what appeared to be an unnecessarily narrow margin; and the examination reads, in part, as follows:
“Q. How wide is ycrar automobile? What is the distance between the wheels? A. The length, or crossway? Q. Across. A. I don’t know. I never measured it. It is the standard size. * * * I can estimate it, if that is what you want. It is between 40 and 45 inches. * * * Q. You say that, as you were going along, after giving these signals, the ice wagon changed its course from the neutral ground towards the gutter? A. Yes, sir; I said so. Q. And I understood you to say that, as the ice wagon did that, it was getting towards the gutter, this toy wagon swerved on such short notice that you couldn’t stop running over it? A. That is correct. * * * Q. And that, at that time, you were running 10 miles an hour? A. Or less. Q. How far from the side of the ice wagon did you pass it? A. Several feet. Q. Oan you estimate that? A. I couldn’t give a correct answer, but I know it was several feet. Q. What do you mean by several feet? A. Exactly what I mean, several feet; I couldn’t tell you how many feet. * * * Q. You testified that you were going at a speed of something less than 10 miles an hour when the accident occurred. Suppose, as a matter of fact, that, after the boy dashed from behind the ice wagon in front of your automobile, you had been going at a speed of 6 or 7 miles an hour, would it have made any difference in the result? A. It would not. Q. The boy was practically immediately beneath the wheels at the time? A. Yes, sir; right absolutely in front of the wheels. He *693 didn’t swerve in front of the machine any distance; he swerved under the wheel.”
Opinion.
The testimony of those witnesses, called by plaintiff, who profess to have seen the accident, is, in some respects, as improbable and contradictory as that of the chauffeur, called by defendant, who imagined that he saw three boys where there were two, and of the little girl, who saw but one of the two, though the existence of the two is undisputed and they were seated in the same open part of a very small box. Thus, one of plaintiff’s witnesses (a girl of 16), who tells, in considerable detail, what she saw of the accident, insisted that both the ice wagon and the automobile were moving towards the lake, though it is beyond dispute that they were moving in the opposite direction. Another (a girl of 14), who was sweeping the banquette in front of the fourth house from Dorgenois street, says that the boys were riding up and down the banquette, and that she told them to get off, and that they tied their little wagon to the ice wagon; that the automobile then came along, and she hollered to them, “You little boys are going to get killed,” whereupon “Henry” looked around and jumped off the wagon, but that the other little boy was knocked out and dragged under the machine. Henry, on the other hand, testifies that he met the other little boy, with his wagon, on the corner of Broad street, which was 200 feet distant from the little girl; that Frank was then coming from a ball game, which had taken place still farther away; that it was then and there that the little wagon was attached to the ice wagon; and that he did not jump out of it, in anticipation of being struck by the automobile, but was still in it when it was struck, and fell out. He further testifies that, in so falling, he rolled on the grass constituting part of the banquette, which, as the collision is said to have occurred about the middle of the roadway, must have been some 18 feet distant, and yet Henry does not appear to have been even bruised. Defendant, as we have stated, was seated on the left side of the tonneau of his machine, and the chauffeur occupied the front seat, on the right, so that, as they came nearer to the scene of the accident and expected to pass on the left of the ice wagon, it may very well have happened that some things escaped defendant’s observation which the chauffeur might, and should, have seen. He, however, gives what appears to us to be the most intelligent and correct account of the accident that we find in the record, and thereby, to some extent, exonerates himself from moral responsibility therefor. But we think that, considering his own testimony and such other testimony as can reasonably be relied on, his legal responsibility is established. It is admitted that both he and the chauffeur saw the ice wagon, with the soap box wagon, containing the two boys, trailing behind it, in ample time (whether at a distance of 150 or of 90 feet) to have enabled them to have fully appreciated the situation and have taken the precautions necessary to avoid an accident. There is no suggestion in the record that there was any other vehicle on the street that interfered or threatened to interfere with them, and all that they had to consider was how not to run over the boys. The first precaution that should have been taken was to give warning of their approach, and defendant says that the horn was blown at once; i. e., at Broad street, 150 feet distant. He does not say that the warning attracted the attention of the persons for whom it was intended, and the whole evidence justifies the belief that it did not. The driver of the ice wagon says that the running over of the little wagon and the first sound of the horn that he heard came almost together, and defendant himself testifies that the driver “positively” *695 heard the signal, because he turned his face, and, being asked, “How far were you from the ice wagon when he turned his face?” he replied, “about 20 feet.” The next precaution should have been to slow down the automobile, so that in no event or situation that was conceivable to its occupants could they kill the boys. Defendant says that at Broad street they reduced the speed from 12 or 13 miles an hour to “10 miles or less,” but it appears that they kept up the 10-mile speed until they got within 20 feet of the ice wagon and gave their first effective signal, and they were then so close to the boys that, in view of the thing that happened, they could not have avoided the accident if they had slowed down to 6 miles an hour or less; and the thing that happened was, in our opinion, something which any reasonable man, who is permitted to operate so dangerous a machine as an automobile in the principal street of a large city, should have foreseen and provided against. If the automobile was within 20 feet of the ice wagon when the horn was blown, it must have been considerably nearer to the little soap box wagon, which was behind the ice wagon, and, as defendant says that his “Claxton” horn made an unusually loud noise, it can readily be understood that its effect upon the boys was to startle them and hurry them into such precipitate action as the situation of each suggested. Our belief, from the testimony, is that the boy Henry, who was merely holding on to the rope by which the little wagon was attached to the other, and whose occupation required no thought, was able to realize the imminence of the danger, and jumped, or more likely tumbled, out of the little wagon, necessarily dropping the rope and severing the connection between the little wagon and the ice wagon. The other boy, Frank, was differently situated. He held the tiller ropes, or strings, and was steering the little wagon, with his back in the direction in which they were going, and, in all probability, his face was turned in that direction (which accounts for the statement by defendant that he did not see his face, though he saw the boy), and, when he realized that the little wagon was no longer attached to the ice wagon, if he had time to realize it, the automobile was upon him. Whether he was run over because he was unable to get out of the way, or because, in his fright, he steered his little wagon in the wrong direction, is hard to say. We have noted that, when asked how far from the left side of the ice wagon it was that he passed it, defendant was .unwilling to go farther in his answer than to say “several feet,” and refused even to make an estimate of the distance in any other terms, from which wo infer that he had well considered the value of the terms thus used by him, which mean “more than two” (feet) “but not very many.” Web. New Int. Die. verbo “several.” It may, possibly, be that he overestimated the distance, and that it was less than two feet, or less than three feet; but let us say that it was as much as three feet, and we have this situation: The chauffeur had
blown his horn; the driver of the ice wagon, 20 feet ahead, had turned his face, in recognition of the signal; and had turned his mules, which were moving in a slow trot, and with them his wagon, and had moved to the right, not fg.r, perhaps, but still he had moved and was moving, for he gives the following testimony upon that subject, to wit:
“Q. When you heard the horn, you pulled your mules” (he was driving two mules) “towards the gutter? A. Yes, sir; to give room to let him go by. Then I heard the noise” (referring to the sound made in the crushing of the little wagon by the automobile) “all at once; I heard the crash and all.”
From which it would appear that, as the little wagon did not move with the ice wagon, because then detached from it and made dependent upon the boy for its motion, it had not gotten out of the way. But, even if that *697 hypothesis be not well supported, the fact remains that the ice wagon and the little wagon were always in plain sight of the chauffeur, who could see that the little wagon was a rickety affair, managed by two little boys, and was hitched to the ice wagon, and common prudence should have suggested that it was a dangerous thing, for the boys, for him to blow his horn, compel the ice wagon to turn, and attempt, at practically the same moment, to pass them within 3 feet at the rate of 10 miles an hour; nor was there any reason for his doing so, since he had a clear space of 10 or 12 feet on the roadway to his left, which was open to him. The defendant seated, as he was, in the rear seat of the automobile, was not in a position to grasp the situation, as the chauffeur should have done, and we can readily believe that, if he had been driving, the accident would not have happened; but the chauffeur was his agent, and had been placed by him in charge of the machine, and he is liable in da mages for the injury inflicted upon plaintiff by reason of his (the chauffeur’s) negligence or want of skill while in the discharge of the duty to which he was assigned, the amount of which damages we assess at $6,000. McFee v. Railroad Co., 42 La. Ann. 790, 7 South. 720; Buechner v. City of New Orleans, 112 La. 600, 36 South. 603, 66 L. R. A. 334, 104 Am. St. Rep. 455; Cherry v. Railroad Co., 121 La. 471, 46 South. 596, 17 L. R. A. (N. S.) 505, 126 Am. St. Rep. 323; Weekly v. Railroad Co., 129 La. 790, 56 South. 889, Ann. Cas. 1913B, 798; Roby v. Railroad Co., 130 La. 898, 58 South. 701; Lea v. Railroad Co., 131 La. 852, 60 South. 370.
It is therefore ordered that the judgment appealed from be set aside and annulled, and that there now be judgment in favor of the plaintiff, Mrs. Mary S. Albert, and against the defendant, Adolph J. Munch, in the sum of $6,000, with legal interest thereon from date of judgment, and all costs.
SOMMERVILLE, J., takes no part.