O’NIELL, Chief Justice.
 

 This is a suit for damages for the death of the plaintiff’s child. He was eight years of age at the time of the accident. While riding in a motor truck in charge of two employees of Edward McCann and Malcolm R. Patterson, defendants in this suit, the child became frightened at the thought of being carried away from his home, and leaped out of the truck. He suffered a fracture of the skull, and died about an hour afterwards. The suit is against Me
 
 *645
 
 Cann and Patterson, owners of the truck, and the Maryland Casualty Company of Baltimore, Md., the liability insurer. The plaintiff charges that the driver of the truck, and his helper, who was on the truck, were acting within the scope of their employment, and were'guilty of negligence, rendering their employers liable, when they allowed the child to ride on the truck, and failed to protect him against his imprudence. The defendants contend that the driver of the truck and his helper, both of whom were in the cab of the truck at the time of the accident, were unaware of the child’s presence in the rear part or body of the truck, until the helper heard the child screaming with fright; that the helper instantly told the driver that he heard the screaming of a child in the truck; and that the driver stopped the truck immediately, but too late, for the child had just then leaped from the rear end of the truck. The defendants deny that either the truck driver or his helper invited or permitted the child to ride upon or in the truck, and aver that, a short time before the accident, the driver and his helper, several times, put off this child and several other small children who persistently tried to ride on the truck; and that the driver and his helper told the children to stay off of the truck, and believed that they had obeyed the order.
 

 The judge of the district court, after hearing the evidence, decided that the truck driver and his helper fulfilled their duty by putting the children off of the truck, and ordering them to stay off, and that the driver and his helper were not aware or obliged to know or to assume that the children had disobeyed their orders. The judge therefore rejected the plaintiff’s demand. The Court of • Appeal affirmed the judgment. See Llorens v. McCann et al., 171 So. 481.
 

 This court issued a writ of review, at the instance of the plaintiff, because the court was of the opinion that, on the facts found by the judge of the district court, and concurred in by the Court of Appeal, the truck driver and his assistant were guilty of negligence.
 

 It was never intended by the provisions of section. 11 of article 7 of the Constitution, which were originally adopted as article 101 of the Constitution of 1898, providing for the issuing of writs of certiorari or review to the Courts of Appeal, that such writs should ever be granted in cases presenting only questions of fact. Act No. 191 of 1898, § 2, p. 437, which gave effect to article 101 of the Constitution 1898,. declares that a party aggrieved by a judgment of the Court of Appeal shall' have the right to bring the cause before the Supreme Court by writ of certiorari or review “for its review and determination on questions of law or jurisprudence or concerning the jurisdiction of” the Court of Appeal. But, in the article of the Constitution itself, it is declared that, when a case has been brought before the Supreme Court in response to a writ of certiorari or review, the court shall proceed to exercise the same jurisdiction as if the case had come here on appeal, or, in the language of the Constitution itself (article 7, § 11), “with the same power and authority in the case as
 
 *647
 
 if it had been carried directly by appeal to the said court.” Brignac v. Pacific Mutual Life Insurance Co., 112 La. 574, 36 So. 595, 66 L.R.A. 322; Pipes v. Gallman, 174 La. 257, 140 So. 40, 42; Wylie v. Shreveport Railways Co., 176 La. 193, 145 So. 513; Decoy v. First National Life Insurance Co., 184 La. 632, 167 So. 172.
 

 Our finding of the facts of this case is in harmony with that of the district court and of the Court of Appeal. When we speak of the facts of the case, we mean the facts that were proved or admitted, not the deductions or conclusions as to whether the truck driver and his helper did their duty in the matter of protecting children from the indiscretion and imprudence which is their characteristic, or as to whether the truck driver and his helper were / negligent in that respect. Whether certain omissions or commissions, in a given state of facts, constitute negligence is a question of law.
 

 The defendants, Edward McCann and Malcolm R. Patterson, at the time of the accident, were engaged in the transfer and delivery business, in the city of Alexandria, under the name of McCann-Patterson Transfer Company. They operated a number of motortrucks, delivering goods for merchants. On the day of this accident, they were employed to deliver a load of furniture to a woman named Susie Caldwell, in the lower suburbs of the city. An employee named Ed Jones drove the truck, and was accompanied by a helper, named Nelse Waddy. The men, knowing what neighborhood Susie Caldwell lived in, but not knowing exactly where she lived, drove down Third street to Williams street, and stopped where three colored boys were playing in the street. Two of the boys were the sons of Patrick Llorens, the plaintiff in this suit, namely, James Llorens, eleven years of age, and Edwin Jerome Llorfens, eight years of age, who was afterwards fatally injured. The other boy was named C. J. Jones. The place where the boys were playing, and where Ed Jones stopped his truck was almost in front of the grocery store of Patrick Llorens. Ed Jones, the truck driver, asked the boys if they knew where Susie Caldwell lived. They replied that they knew where the Caldwell house was, and they offered to go and show the men. The boys got upon the truck, intending to ride to the Caldwell house, which was on John Thomas street, only one block further down Third street, and was less than half a block off from Third street. It so happened that Susie Caldwell was in Patrick Llorens’ store at that time, and, hearing that the truck was there with her furniture, she went out and directed the men to her house, saying that it was right around the next corner and was the second house on the left. She then returned to the store to get the key to her house, and one of the two Llorens boys, she did not remember which one of them, followed her into the store and, taking the key from her, said that he would go and show the men where the house was. The boy went out of the store, and Susie Caldwell remained in the store a few minutes, to finish her buying, and then went to her house and directed the men as -to where to place the furniture. It appears that she had rented
 
 *649
 
 the house hut had not yet moved into it. An important question in the case is whether the boys were allowed to ride to the Caldwell house on the truck, or were put off, and walked there. Both the district court and the Court of Appeal left that question undecided. The judge of the district court said — and the Court of Appeal quoted the statement with approval — that “if any of the boys actually rode upon the truck around to the Caldwell house it was not because they were requested to do so, but merely by sufferance.” The truck driver and his helper both testified that the boys mounted the running board of the truck when it left the Llorens store, on its way to the Caldwell house, but that the driver stopped and ordered the boys off, and that they got off of the truck, after it had gone only about 30 feet, and hence that the boys were not allowed to ride to the Caldwell house. In that respect the testimony of the truck driver and his assistant is not corroborated by any evidence in the record, and is contradicted by the testimony of the two survivors of the three boys, and by the testimony of four other colored boys, three of whom testified that they saw the three boys riding on the truck towards the Caldwell house, and one of whom testified that he saw the three boys get off of the truck at ’the Caldwell house. Besides, Nelse Waddy, the truck driver’s helper, in his testimony, said that, when the truck stopped in front of the Caldwell house, and an old man standing in the gateway informed the driver that that was the Caldwell house, “the boys were standing around the truck at the time.” It is not likely that the boys could have arrived at the Caldwell house as soon as the truck arrived unless they rode there on the truck. There are, very naturally, as the district court and the Court of Appeal found, some discrepancies in the testimony of the six boys, but there are also, as both courts found, some discrepancies in the testimony of the truck driver and his helper. We are convinced that the three boys did ride on the truck from the Llorens store to the Caldwell house. It is quite likely, as the two courts have held, that the boys were not expressly invited — for they needed no invitation. — to ride on the truck to the Caldwell house. Their riding on the truck was by sufferance, that is, with the implied consent of the truck driver. Hence the boys were not trespassers on the truck. The importance of this is that when the boys were allowed to ride from the Llorens store to the, Caldwell house they were apt to believe that they would be allowed to return the same way. When the truck arrived at the Caldwell house James Llorens, the elder of the two brothers, returned immediately to his father’s store. Three other colored boys, namely, Paul Dupre, Sidney Thomas, Jr., and Morris Thomas, all about or under the age of fourteen years, and all residing in the immediate neighborhood, on John Thomas street, came upon the scene. The four survivors of the five boys testified that they assisted the men in unloading the furniture, by carrying light articles, such as bed sides or bed slats, and chairs, into the Caldwell house. The two men and Susie Caldwell denied that the, boys rendered any such assistance. The men testified that the boys
 
 *651
 
 interfered with the unloading, by climbing upon the truck, and that they had to be run off of the truck several times during the unloading. It is likely that the boys were a nuisance to the men in the unloading of the truck, even though the boys, in their childish way, might have thought that they were rendering some service. Whether the boys did or did not assist in the unloading of the truck is a matter of no importance, except in so far as it may affect the credibility of the witnesses. The important question is whether the men knew, and should have known, that the boys were riding in the truck when it backed away from the Caldwell house and out John Thomas street to Third street. The four survivors of the five boys testified that, when the men had finished unloading the' truck, and came out of the Caldwell house the last time, they, the five boys, including the little Llorens boy, were seated in the back of the truck, their legs hanging from the rear end of the truck; and that they were seen there by the truck driver and his helper, and were allowed to remain there while the truck backed out of John Thomas street and turned into Third street, and stopped momentarily for the driver to shift his gears and go forward, towards town. At that moment the three boys who lived in the neighborhood, namely, Paul Dupre, Sidney Thomas, Jr., and Morris Thomas, jumped off of the back of the truck, in or about the middle of Third street, leaving the little Llorens boy and C. J. Jones in the truck. Dupre and the two Thomas boys watched the truck as it drove off, until they saw C. J. Jones jump out, just beyond the Llorens store, and they ran to see what had happened to him; but before they got to him they saw the Llorens boy jump out of the truck. The testimony of Paul Dupre and the two Thomas boys, to the effect that they were in the truck until it had backed into Third street and stopped while the .driver shifted his gears, is corroborated by the testimony of a colored school teacher, who testified that she was in front pf her home near the corner of Third and John Thomas streets and saw the five boys riding in the rear end of the truck as it backed out of John Thomas street, and saw the three boys jump off of the back of the truck when it stopped in Third street while the driver shifted his .gears. The witness said that she saw the two other boys remaining on the truck when it went forward. The witness was ac- ■ quainted with all of the boys, and named the three who jumped off and the two who remained on the truck, when it started forward, up the street. When the truck passed the Llorens store, C. J. Jones jumped out, but was not seriously hurt. The little Llorens boy then, seeing that he was being carried away to some unknown destination, became frightened and began to scream to the men to stop and let him get off. A woman testified that she was on the porch of her home on Third street, a short distance above the Llorens store, and heard the child screaming, and could see him, through the slatted side of the truck, and saw him go forward to the back of the cab to attract the attention of the men in the cab, just before he leaped from the rear of the truck. The attorneys for the defendant tried to
 
 *653
 
 discredit this witness, by trying to show that she could not have seen through the side of the truck, but the manager of the defendants’ business, who described the truck, admitted frankly that the woman could have seen the child through the side of the truck. That' testimony is of little or no importance, because it is not contended that the men in the cab of the truck heard the child screaming, or should have heard him, before it was too late to avoid the accident. The negligence which is charged in this case is that the men in charge of the truck either knew that the child was in the truck when it, left John Thomas street, and forgot to stop and let the child off at his father’s store, or were guilty of negligence in failing to observe that the child was in the truck. On that subject the testimony of the driver and his helper does not absolve them of all blame. They testified that, when they had unloaded the truck and had come out of the Caldwell house the last. time, and saw that the children were in the truck, they ordered them off, and that they got off. The driver says that, after he had started backing up towards Third street, the children got on the truck again, and that he ordered his helper to put them off again, and that they got off of the truck again, and that he thought that they had remained off. The helper testified that, after he had put the children off of the truck, and before the truck started backing out of John Thomas street, he stood on the running board, beside the cab, on the right side of the truck, and watched that side of the truck all the way back to Third street, and did not see the children get upon the truck again. Meanwhile the driver was at the wheel, watching the left side of the truck. It seems impossible, therefore, for the children to have boarded the truck without being seen by either the driver or .his helper, after- the truck left the Caldwell house. It was after sunset, but not dark. Neither of the men suggested in his testimony that his vision was obscured at all; nor was any such defense made in the answer to the suit. John Thomas street is very narrow, so narrow that it is referred to in the testimony as an alley. If the five boys were left behind, in front of the truck, when it backed away from the Caldwell house, as the truck driver and his helper say they were, it would have been impossible for the boys to pass the front end of the truck while it was in motion and get into the back of the truck without being observed by either the driver or his helper. It is certain that the five boys were in the truck when it backed into Third street, because three of them jumped out when the truck stopped for an instant in Third street, and the two other boys remained in the truck. That is not disputed. As the boys could not have boarded the truck after it left the Caldwell house, it must follow, as the night the day, that they were in the truck when it left the Caldwell house. Nelse Waddy, the driver’s helper, testified that, from his position on the running board of the truck, beside the cab, looking back along the right side of the truck, he could not see inside of the truck, because the sides of the truck were solid walls for a distance of 3 feet back of the cab, and to the height of S feet
 
 *655
 
 above the floor of the truck. The truck driver might have seen the boys in the truck, through the glass window in the back of the cab; but he testified that he did not see them in the truck after they were put off near the Caldwell house. The driver and his helper must have known — or ought to have known — that the boys were in the truck; and the driver and his helper ought to have observed, when three of the boys jumped out of the truck when it stopped in Third street, that only three of the boys jumped out. Our conclusion, therefore,' is that it was negligence on the part of the truck driver and his helper to overlook the eight year old child in the truck, and to carry him past his father’s store, whence he had come.
 

 The man who was acting manager of the defendants’ transfer business at the time of the accident testified that every truck driver was instructed not to pick up or carry any one on his truck, and that the trucks had “across the front of them ‘No Riders.’ ” We infer from this that the warning, “No Riders,” was intended not to warn the public, but to remind the truck drivers not to allow any riders. This “No Riders” warning was not referred to elsewhere in the testimony, or set up as a defense in the answer to the suit. In that respect the defendants merely pleaded that, if the children were permitted by the driver to ride on the truck, which the defendants denied, the permission was beyond the authority of the driver, and beyond the scope of his employment, and was in fact contrary to the instructions which were given him, and hence that the defendants were not responsible for the driver’s conduct in that respect. Our answer to this is that an employer cannot relieve himself from responsibility for negligence on the part of his employee, within the scope of his employment, by merely warning or instructing him to avoid such negligence.
 

 The law on the subject of the care which the operator of an automobile or a truck is obliged to take to avoid injuring children is laid down in Blashfield’s Cyclopedia of Automobile Law and Practice, Vol. 2, Permanent Edition, chap. 38, § 1510;' in Berry’s Law of Automobiles (6th Ed.) Vol. 1, chap. XIII, Injuries to Children, § 519; and in Huddy’s Cyclopedia of Automobile Law (9th Ed.) Vol. 5-6, chap. I, Duty of Motorist to Avoid Injury to Pedestrians, § 44, Children Climbing onto Car, pp. 67-69. The degree of care to be observed depends, of course, upon the age of the child. The rule is that children must be expected to act upon childish instincts and impulses, and not to exercise the discretion and prudence necessary for their safety, with regard to dangerous agencies. It has been held that an eight year old boy is chargeable with contributory negligence, but the majority rule is the other way. In the present case contributory negligence is not pleaded. It is not possible to lay down a rule for measuring the degree of care that a motorist owes to children, according to age, and the varying circumstances in which motorists come in close proximity to children. It has been held that a truck driver who sees children playing about or on his truck while it is stopped, and orders
 
 *657
 
 them off, and carefully looks around the truck to see that none of the children has remained on the truck, is not responsible for an injury suffered by one of the children who concealed herself on the truck so that the chauffeur was not at fault for overlooking her before he started his engine. Ostrander v. Armour & Co., 176 App.Div. 152, 161 N.Y.S. 961; 1 A.L.R. 1386, Note; 5 Am.Jur. p. 639, § 246. In the present case, however, the children did not conceal themselves on the truck. The driver could not have overlooked them if he had looked into the truck before starting it forward after backing out of John Thomas street. The doctrine that is applicable to this case is that, when a truck driver sees that children have' climbed upon his truck while it is stopped, and knows that they intend to ride on the truck, he must not only put them off, before starting his engine, but must exercise reasonable care to see that they stay off. The younger the children are, and the more persistent they are, the more determined the truck driver ought to be to avoid injuring them. We are not aware of a case like this in our jurisprudence, but the rule which has been established with regard to the duty that automobile drivers owe to children in the streets is very strict. For example, in Albert v. Munch, 141 La. 686, 75 So. 513, L.R.A. 1918A, 240, the court went so far as to say that the driver of an automobile who sees, 150 feet in front of him, two boys, of the age of ten and twelve years, respectively, trailing in a soap-box wagon behind an ice wagon, “should take such precautions in his driving as that, in no event or situation, conceivable to an intelligent man, will he run over and kill the boys.” That was cited with approval in Guillory v. Horecky, 185 La. 21, 168 So. 481, and by the Court of Appeal in Brown v. Wade, 145 So. 790, 793, and in Moreau v. Southern Bell Telephone & Telegraph Co., 158 So. 412, 415.
 

 The assessment of damages for the death of a child is a matter in which, according to the Civil Code, art. 1934, subd. #3, “much discretion must be left to the judge or jury,” as the case may be. The plaintiff in this case claims $17,000. Following the precedent set in Guillory v. Horecky, and Brown v. Wade, supra, and adopting approximately the average of the amounts allowed in the cases listed in Brown v. Wade, we have concluded that the amount of the judgment in this case should be $2,500. The liability insurance, for injury to or death of one person, exceeds that amount. Hence the Maryland Casualty Company is liable, in solido with the defendants, and primarily, for the payment of the $2,500.
 

 The judgment appealed from is reversed, and it is now ordered, adjudged, and decreed that the plaintiff, Patrick Llorens, shall recover of and from the defendants, Edward McCann and Malcolm' ,R. Patterson, and the Maryland Casualty Company, of Baltimore, Maryland, in solido, the sum of $2,500, with legal interest thereon from judicial demand, that is, from the 3d day of April, 1935, and all costs of this suit.
 

 ODOM, J., dissents.