TATE, Judge
(dissenting).
I respectfully dissent.
If the accident took place as the majority reconstructs it, then of course the defendant driver could not reasonably have stopped in time to have avoided the accident. The trial court drew a different inference from the evidence, however, under which the defendant Lowery had more time .■and opportunity to observe the 7-year old boy bicycling towards the roadway and to avoid the accident, as a result of which the motorist breached the extremely high standard of care owed by him to young ■children near the roadway.
I personally do not think the trial court was manifestly erroneous in its appreciation to this effect of the facts.
But I dissent primarily because, even under the majority’s own appreciation of the facts, it committed error as a matter of law in failing to hold the motorist to the •duty of extraordinary care owed by him -to a child whom he observes near or approaching the roadway. Had the motorist ■simply sounded his horn when he says he first saw the child, the accident would have ibeen avoided.
I.
Before going into the facts of the present •case, we should advert briefly to the jurisprudence concerning this duty.
As the majority notes, a motorist is not negligent if a child suddenly darts into his path from a concealed position, when the motorist could not reasonably have anticipated the child’s presence near the roadway. Layfield v. Bourgeois, La.App. 3 Cir., 142 So.2d 799. However, as that opinion also notes, if a motorist does see or reasonably should see children near the roadway, he owes them not merely the duty of ordinary care, but instead the duty of a very high degree of care, i. e., extraordinary care.
As stated in the early leading case of Albert v. Munch, 141 La. 686, 694-695, 75 So. 513, 515, L.R.A.1918A, 240, where a chauffeur and his employer were held negligent for failing to take evasive action when they saw children ahead, “The first precaution that should have been taken ivas to give warning of their approach * * *. The next precaution should have been to slow down the automobile, so that in no event or situation that was conceivable to its occupants could they kill the boys. * * * ” (Italics mine.) See also Guillory v. Allstate Insurance Co., La.App. 1 Cir., 96 So.2d 866, certiorari denied as to merits, although granted as to costs.
As this court itself recently observed in Burnaman v. La Prairie, 140 So.2d 710, 711, certiorari denied, holding a motorist liable for failure to observe the duty of extraordinary care owed toward children, “It is clear that under the Louisiana jurisprudence the operator of an automobile has a duty demanding a high degree of care if children (who are unaccompanied by their parent and not under the care of an adult) are in the vicinity and he knows of their presence or is held to know of their presence as a matter of law.”
A good summary of the Louisiana rule and the reasons for it is found in Peperone v. Lee, La.App.Orl., 160 So. 467, 468: “ * * * when children are seen on the side of a road, an approaching motorist must anticipate childish actions, as, for example, the sudden running across the road * * *. In a word, the presence of children on or near a highway imposes upon a motorist the duty of exercising extraordinary care and every reasonable precaution must be taken to avoid injuring them. Children * * * are properly the subject of public solicitude, and the law requires that those who operate such dangerous instrumentalities as automobiles in their vicinity must do so with the utmost care. :|c * *»
See also 3 West’s Louisiana Digest, Automobiles, 162(1) for multitudinous other citations to the same effect.
*312 Also, there can be no issue that contributory negligence bars recovery in this case. At the time of the accident, young Keith was seven years and ten months old, and he was also, as the trial court found, very small and delicate for his age.
Under the law of Louisiana, a child under eight years of age is ordinarily incapable of contributory negligence (Jackson v. Jones, 224 La. 403, 69 So.2d 729), although a child of eight years and over may be old enough to fall within the rule of contributory negligence (Lynch v. Knoop, 118 La. 611, 43 So. 252, 8 L.R.A.,N.S., 480) ; however, even if it has been established that a child is capable of contributory negligence, such negligence is nevertheless not measured by the same standard applied to an adult, but must be judged in accordance with the individual child’s experience, understanding, age, and intelligence (Plauche v. Consolidated Companies, 235 La. 692, 105 So.2d 269). See also: Danna v. London Guarantee & Accident Company, La.App. 2 Cir., 147 So.2d 739; Guillory v. Allstate Insurance Co., La.App. 1 Cir., 96 So.2d 866; Annotation, “Contributory Negligence of Children”, 174 A.L.R. 1080, especially: 1106, 1128, 1134 (Louisiana references).
We have in this dissent repeated and emphasized these legal principles applicable, for one purpose only, namely: To illustrate that, whatever conscious or unconscious sympathy we may have for the understandable actions or inactions of the motorist under the circumstances, nevertheless the only question before us, as a court of law, is whether, after the motorist saw or should have seen the child approaching the roadway, did even the slightest negligence on the motorist’s part contribute to the accident? If so, he is liable, for he violated the duty of extraordinary care owed to the child under such circumstapces.
II.
The trial court found, and apparently the majority agrees, that the motorist’s duty to observe young Keith bicycling towards-the roadway arose when this 7-year old boy appeared from behind a large bush at the fence line. At any rate, the defendant Lowery testified positively that he saw the boy just as soon as he emerged from behind the bush. Tr. 144, 148, 158.
According to the defendants’ surveyor, this bush was 23 feet from the edge of the roadway, at the end of a ramp or bridge across the driveway. Tr. 170. According-to all the witnesses, motorists approaching from the south as was the defendant Lowery, had a clear view of this entire ramp-way, from a distance down the roadway of 300 feet and more.
As the majority found, the boy was struck in the center of the roadway, which according to the defendants’ surveyor had a total width of 19 feet. Tr. 162. This-means, of course, that the very small boy bicycled about 33 feet on gravel (the ramp plus half of the road) before the defendants’ truck struck him.
Lowery testified that he collided with the boy’s bicycle at a point 4 feet south of the ramp, near the center of the road. Tr. 146.
The two other witnesses to the accident (the seriously injured boy did not know where he was struck) testified that the collision occurred in the center of the road, approximately even with the south edge of the ramp, and that the truck stopped immediately. Tr. 170, 213. These witnesses further testified that the bicycle was right under the truck bumper at the time the truck stopped, Tr. 120, 213, one of them indicating that if the truck had skidded the least little distance further the boy would have been run over and probably killed. Tr. 213.
A photograph of the bicycle taken immediately after the accident is in evidence. P-6. It shows that the bicycle was bumped and not run over, which seems to verify the testimony of these witnesses that the defendants’ truck stopped approximately in *313 stantly with the collision, without skidding further.
It is actually immaterial, however, where the truck knocked the boy and the bicycle to the ground and then immediately stopped, whether at a point 4 feet south of the driveway or at the driveway itself.
For the uncontradicted evidence shows that, after Lowery first saw young Keith ■approaching the roadway, young Keith was ■able to travel the entire length of the ramp '(23 feet) plus at least half the length of the roadway (9j/£ feet, i. e., one-half of the 19-foot width), or a total of at least 32 feet, before he was struck. It also shows that he was struck just as the truck stopped, so that if the truck had stopped a foot sooner — or if Keith himself had stopped sooner or had veered a foot north — , then no accident would have taken place. Yet during this interval no horn was sounded to alert the boy to the impending disaster.
The majority has accepted Lowery’s testimony at face value and has concluded that he could not possibly have stopped his truck any sooner. That may be true; but the majority has overlooked that the accident could also have been avoided by the slightest possible warning to Keith, that is by Lowery’s sounding the truck’s horn as soon .as he saw the boy.
Since the truck stopped instantly with the collision, an instant’s warning was all that was needed — for the boy to stop on the ramp, or to veer north and away from the approaching truck instead of south tozvard it — ■, this instant’s warning was all that was needed to avoid the accident. And the un-■contradicted testimony, and Lowery’s own admissions, show that the single tap of the horn that could have avoided the accident and the boy’s injuries, this single sounding ■of the horn was nevertheless not given.
The Louisiana jurisprudence holds that the duty of extraordinary care owed by a motorist towards a young child observed by him, includes not only the duty to bring his car under control to stop immediately, but also the duty to sound the horn and warn the child not to dash into the motorist’s path. See Albert v.. Munch and Guil-lory v. Allstate Insurance Co., cited above. The trial court correctly held the motorist liable for failure to perform this duty.
III.
Actually, the evidence in the record, it seems to me, is less favorable to the defendants than construed to be by the majority. I find no manifest error in the trial court’s factual appreciation that it presents a last clear chance case (although very close) in the classic pattern of Rott-man v. Beverly, 183 La. 947, 165 So. 153, and Jackson v. Cook, 189 La. 860, 181 So. 195. Under this factual appreciation, due to inattention, the motorist did not observe the young boy when he came into clear view on the ramp bicycling toward the roadway, although the motorist reasonably should have, as a result of which the latter did not apply his brakes sufficiently soon. He could thus reasonably have avoided the accident even without sounding his horn.
I do not wish to clutter this dissent with details, but the majority’s analysis of the facts is obviously faulty.
For instance, the observation is made that the motorist could hardly have stopped sooner, even if he had attempted to do so after the first boy entered the road. This is a truly astounding assertion under the evidence in this record, and not even the defendants claim this to be so.
As a matter of fact, the defendant motorist and his passenger testify positively that his motor vehicle came to a stop within 15-20 feet from the time the brakes were applied with perhaps an additional ten feet of reaction distance. Tr. 145. So far as the record shows, there was nothing to prevent the truck from having been stopped so quickly 50-100 feet further back, if the motorist had observed the young boy approaching the roadway at such earlier time.
The majority’s obvious error in this regard consists in taking as gospel the motor *314 ist’s rough estimate of his speed (“perhaps thirty-five miles per hour”, Tr. 144), and then applying to this estimate the stopping times of standard stopping charts.
These charts, however, are based on average reaction times of J4th 1° one second and on standard average braking efficiencies —although reaction times actually may vary from l/^th second to over two seconds, depending on the individual and the circumstances, and although the present truck may have had vastly greater or less braking efficiency than such hypothetical average. For this reason, because of the many variable factors, these standard stopping charts are of little use insofar as attempting to determine the speed, ability to stop, time to stop, etc., of a given vehicle after a given accident — the variables in the speed-stopping formula must be fixed for that given vehicle in that given accident. Baker, Practical Use of Speed Charts, 2 Defense Law Journal 1S6 (1957).
Again, if we apply the time sequence set out in the majority opinion, to the speed of the young bicyclists, we then have the incredible result that these young boys (7 and 11 years old) were bicycling at a speed of about forty miles per hour down a gravelled driveway and down the edge of a gravelled roadway, faster than the defendants’ pickup truck.
I cannot reiterate too strongly that an appellate court exceeds its power of appellate review when it reverses trial court factual determinations, primarily because of the appellate court’s imaginative reconstruction of the evidence, based upon deducing supposed exact facts from, and applying supposedly exact mathematical formulas to, the very rough estimates of the distances, speeds, and times by the witnesses.
The witnesses’ estimates of these are not recorded at the time of observation by means of a tape-measure or a stop-watch or a speedometer-reading. They are rough attempts, after the event, to estimate what was usually not actually well observed at the time.
The function of the court is not to use these rough estimates as if they were fixed quantities, which enable the court to arrive at the truth as though the truth can be-reached by impersonal mathematical formulas.
In the present case, for instance, the court’s basic function was to determine from the evidence whether the driver should reasonably have been able to stop (or otherwise avoid the accident) in time to have avoided striking the boy, after the driver reasonably came under the duty to observe the young boy approaching the roadway. In this regard, the trial court did not accept the driver’s testimony tending to prove he could not reasonably have stopped sooner (although he failed to explain why he could not have sounded his horn sooner),, because of certain inconsistencies between it and the testimony of his passenger and of the circumstance that in fact the young bicyclist, approaching at a lower speed than the pickup truck, was able to travel 33-37 feet in the clear view of the pickup truck before he was struck, reasonably indicating that the driver of the pickup truck did not see the boy as soon as he said he did.
This evaluation of credibility should not be reversed on appellate review, in the absence of manifest error. It certainly should not be reversed on the basis of obviously inapplicable mathematical formulas, especially when the party against whom they are applied has not been given the opportunity, by cross-examination or otherwise, to contest the applicability of this hearsay opinion evidence to the actual present facts.
I may say here that the defendant Lowery is a very responsible and a very fine member of the community. There is no doubt that he conscientiously attempted to tell the truth as he remembered it. But who of us, after striking and seriously injuring a young child, is going to admit, even unconsciously to one’s own self, that it is our own carelessness that caused the injury to the child? Our memory naturally selects or interprets *315 incidents most favorably to ourselves, from among the confused and unnoted (at the time) events of the few seconds preceding and at the time of crisis. In evaluating credibility, it was not improper for the trial court to take this into consideration, in reconciling the opposing testimony of contradictory witnesses with the physical facts of an accident.
For the reasons above stated, I therefore respectfully dissent from the majority’s reversal of the trial court.